IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

BRIAN S. L.,                                    )
Administrator, Of the Estate of TINA            )
L. L., Deceased,                                )
                                                )
                        Plaintiff,              )
                                                )
v.                                              )        Civil Action No. 1:21cv00423 (AJT/JFA)
                                                )
KILOLO KIJAKAZI,                                )
Acting Commissioner of Social Security,         )
                                                )
                        Defendant.              )
                                                )

## REPORT AND RECOMMENDATION

This matter is before the undersigned magistrate judge for a report and recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment. (Docket nos. 16,

18). Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of Kilolo

Kijakazi, Acting Commissioner of the Social Security Administration ("Commissioner"),

denying plaintiff's claim for disability insurance benefits ("DIB") under the Social Security Act.

The Commissioner's final decision is based on a finding by the Administrative Law Judge

("ALJ") and Appeals Council for the Office of Appellate Operations ("Appeals Council") that

plaintiff was not disabled as defined by the Social Security Act and applicable regulations.[1]

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to
Local Civil Rules 5 and 7(C). (Docket nos. 14, 17). In accordance with those rules, this report
and recommendation excludes any personal identifiers such as plaintiff's social security number
and date of birth (except for the year of birth), and the discussion of plaintiff's medical
information is limited to the extent necessary to analyze the case.

# I. PROCEDURAL BACKGROUND

On January 17, 2018, plaintiff applied for DIB with an alleged onset date of January 17, 2017. (AR 311–12). Plaintiff was represented in her claim by Sean Sullivan. (AR 167–68). The Social Security Administration ("SSA") initially denied plaintiff's application on June 29, 2018. (AR 170–72). Plaintiff requested reconsideration of the denial on July 19, 2018, (AR 181), and the SSA affirmed its denial on August 20, 2018. (AR 182–84). On October 4, 2018, plaintiff requested a hearing before an ALJ. (AR 189–90). The Office of Hearing Operations acknowledged receipt of plaintiff's request on November 2, 2018, (AR 191–96), and scheduled a hearing before an ALJ for September 23, 2019. (AR 209–21).

On September 23, 2019, ALJ Paul Armstrong held a hearing on plaintiff's claim. (AR 98–130). Plaintiff appeared with Mr. Sullivan as her representative. (AR 99). Plaintiff provided testimony and answered questions posed by the ALJ and her representative. (AR 104–21, 125, 127). A vocational expert also answered questions from the ALJ and plaintiff's representative. (AR 115, 121–24, 127–28). Following consultive medical and mental examinations, ALJ Armstrong held a second hearing by telephone on May 19, 2020. (AR 59–97). Plaintiff again appeared with Mr. Sullivan as her representative. (AR 60). Plaintiff provided testimony and answered questions posed by the ALJ and her representative. (AR 66–90). A vocational expert also answered questions from the ALJ and plaintiff's representative. (AR 91–96).

On August 26, 2020, the ALJ issued a decision finding that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act.[2] (AR 34–49). On September 24, 2020, plaintiff sent a request for review of the ALJ's decision to the Appeals Council. (AR 308–

---

[2] The ALJ issued a prior unfavorable decision on plaintiff's claim on June 5, 2020 but vacated the decision after receiving additional evidence and a request to keep the record open for additional evidence. (AR 163–66).

10). The Appeals Council granted plaintiff a twenty-five (25) day extension to supplement her request for review on September 28, 2020. (AR 20–21). On February 1, 2021, the Appeals Council denied plaintiff's request for review, finding no reason under its rules to review the ALJ's decision. (AR 13–16). As a result, the ALJ's decision became the final decision of the Commissioner. (AR 13); *see* 20 C.F.R. §§ 404.981, 416.1481. Plaintiff was given sixty (60) days to file a civil action challenging the decision. (AR 14); *see* 20 C.F.R. §§ 404.981, 416.1481.

On April 5, 2021, plaintiff filed this civil action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Docket no. 1). On August 20, 2021, the court set a briefing schedule for the parties' cross-motions for summary judgment. (Docket no. 15). Plaintiff filed her motion for summary judgment on September 10, 2021. (Docket no. 16). The Commissioner filed her cross-motion for summary judgment on October 1, 2021. (Docket no. 18). Plaintiff filed a reply on October 15, 2021. (Docket no. 23). The case is now before the undersigned for a report and recommendation on the parties' cross-motions for summary judgment. (Docket nos. 16, 18).

## II. STANDARD OF REVIEW

Under the Social Security Act, the district court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a mere scintilla of evidence but may be somewhat

3

less than a preponderance." *Id.* (internal quotations and citations omitted). In determining

whether a decision is supported by substantial evidence, the court does not "undertake to re-

weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that

of the Secretary." *Id.* (alteration in original) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir.

1996)). It is the ALJ's duty, and not that of the reviewing court, to resolve evidentiary conflicts,

and the ALJ's decision must be sustained if supported by substantial evidence. *Smith v. Chater*,

99 F.3d 635, 638 (4th Cir. 1996).

## III. FACTUAL BACKGROUND

### A.   Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1974 and was forty-two years old at the time of the alleged onset of

disability. (AR 48). Plaintiff completed high school. (AR 333). From 2003 until 2017, plaintiff

worked as a bus driver for Fairfax County Public Schools. (AR 325–26, 334).

### B.   Overview of Plaintiff's Medical History and Treatment[3]

A brief overview of plaintiff's medical history and a short summary of her treatment is

provided to give a framework for the more detailed discussion of plaintiff's medical issues and

claims that follows. Plaintiff's medical history includes diagnoses of neurocardiogenic syncope,

left radial nerve palsy, disc degeneration disease, degenerative joint disease, spinal stenosis,

obesity, chronic pain syndrome, chronic sinusitis, bilateral mastoiditis, thrombocytopenia,

diabetes mellitus, cervical dystonia, frozen shoulder, left foot drop, bursitis, carpal tunnel

syndrome, left plantar fasciitis, sleep apnea, anxiety, depression, and post-traumatic stress

---

[3] The AR contains over 1,500 pages of medical records from various sources relating to
plaintiff's medical treatments. This summary provides an overview of plaintiff's medical
treatments and conditions relevant to her claims and is not intended to be an exhaustive list of
every medical treatment.

disorder.[4] (AR 454, 472, 479–81, 506, 628, 726, 749, 799, 803, 806, 855, 861, 994, 1001, 1021, 1143, 1214, 1272, 1679–80, 1741, 1758, 1931–32, 1947–1950). Plaintiff died on October 30, 2020 at the age of forty-six. (Docket no. 17). Plaintiff's death certificate, which was filed as a supplement to the administrative record, indicates that her causes of death were diabetes, neurocardiogenic syncope, obesity, and tobacco abuse. (Docket no. 17).

### i. Plaintiff's Neurocardiogenic Syncope Diagnosis and Treatment (January 2017–March 2020)

On January 20, 2017, plaintiff was seen at Telegraph Corner Family Medicine PC for sinus issues and a pulled muscle in her neck. (AR 806). Plaintiff reported pain and difficulty turning her head to the left. (AR 806). Plaintiff was prescribed Soma for the pain and Augmentin. (AR 806). On January 25, 2017, plaintiff attended a follow-up appointment with her primary care physician, Dr. Priscilla Taylor. (AR 805). Plaintiff stated that it hurt to breathe and reported ear pressure and chest tightness. (AR 805). Plaintiff also reported dizziness and disorientation, which prevented her from driving.[5] (AR 805). Dr. Taylor observed redness of plaintiff's right tympanic membrane, maxillary tenderness, and drainage. (AR 805). Dr. Taylor diagnosed plaintiff with sinusitis, prescribed Levaquin and continued Augmentin, and excused plaintiff from work. (AR 805).

---

[4] The AR includes several additional pre- and post-onset diagnoses and treatments. In 2012, plaintiff was diagnosed with cervical cancer and underwent a hysterectomy. (AR 497). Plaintiff also underwent gastric bypass surgery in 2013. (AR 419). In 2016, plaintiff reported abdominal pain and was diagnosed with an ovarian mass. (AR 496–505). Plaintiff's medical history also reflects recurring treatment for dental issues. (AR 490, 809, 1226).

[5] Plaintiff testified at her disability hearings that the dizziness began during one of her shifts as a bus driver. (AR 67, 105). She testified that she stepped off the bus to stretch during a break between runs and began to feel dizzy and disoriented. (AR 67, 105). Plaintiff called the school district, and they sent out a relief driver to replace her so she could seek medical treatment. (AR 70).

On February 14, 2017, plaintiff saw Dr. Taylor for recurrent dizziness. (AR 804). Plaintiff reported spinning and indicated that everything turned "black" when standing. (AR 804). Dr. Taylor observed right ear drainage, and plaintiff stated that she was experiencing ear pressure and pain, but there was no evidence of sinusitis. (AR 804). Dr. Taylor prescribed Soma and diagnosed plaintiff with vertigo and referred her to an ear, nose, and throat specialist (ENT). (AR 804).

On February 17, 2017, plaintiff saw her ENT, Dr. Richard Comstock. (AR 434). Plaintiff reported moderate dizziness and indicated that the room was spinning and that she felt lightheaded and clumsy. (AR 434). Plaintiff reported that her dizziness was aggravated by standing too quickly, bending, and moving her head. (AR 434). Plaintiff also reported popping in her ears, discharge from her right ear, otalgia, ear pressure, a sore throat, nausea, and vomiting. (AR 434). Dr. Comstock noted that plaintiff had a retracted tympanic membrane and mild sensorineural hearing loss in her left ear. (AR 435). Dr. Comstock also noted that plaintiff had a history of sinus infections, and he ordered a CT. (AR 436). Plaintiff's sinus CT revealed a small focal dehiscence and an opacified ethmoidal air cell, but plaintiff's sinuses were otherwise clear and there was no obstruction. (AR 453).

At a follow-up appointment with Dr. Taylor on March 1, 2017, plaintiff reported continued ear pressure and hearing loss. (AR 803). Dr. Taylor reviewed plaintiff's labs and noted that her platelet count was low. (AR 803). Dr. Taylor again diagnosed plaintiff with sinusitis and prescribed a Z-Pak. (AR 803).

On March 8, 2017, plaintiff was referred to Inova's neurology clinic for evaluation of severe intractable headaches. (AR 486). Plaintiff reported onset about a month and a half earlier and indicated that she had a history of migraines but that the headaches felt different in terms of

6

severity, frequency, and accompanying symptoms. (AR 486). Plaintiff reported near daily headaches that started in her neck and the back of her head and radiated forward, accompanied by significant intermittent dizziness. (AR 486). Plaintiff also reported occasional room spinning and that everything went black when she stood or bent her head upwards. (AR 486). Plaintiff's neurologist, Dr. Sean Rogers, expressed concern about a dissection, and he ordered an MRI of plaintiff's neck and brain and an MRA of her neck. (AR 487). Dr. Rogers also prescribed gabapentin and methylprednisolone. (AR 992). Plaintiff's brain MRI revealed no significant intercranial abnormality but did show bilateral mastoiditis that was greater on the left side and evidence of mild sinus disease. (AR 454). Plaintiff's neck MRI revealed only mild non-impinging disc protrusions at C4-5 and C6-7 and her neck MRA was normal. (AR 455–57).

On March 15, 2017, Dr. Comstock referred plaintiff for a videonystagmography ("VNG") test. (AR 430, 446). The VNG results identified abnormal velocity, latency, and accuracy of saccades in the leftward direction. (AR 446). Plaintiff complained of headaches and worsening facial pressure, and Dr. Comstock observed tenderness over plaintiff's left submandibular glands. (AR 430). Plaintiff's labs also reflected a decreased platelet count, and plaintiff was encouraged to see her hematologist.[6] (AR 431–32). Plaintiff was prescribed Imitrex for her headaches. (AR 432).

At a March 30, 2017 follow-up appointment with Dr. Comstock for her dizziness, plaintiff reported worsening symptoms that were unresolved with Imitrex. (AR 425). Plaintiff indicated that everything turned black when standing and that she saw spots after the dizziness subsided, but she denied syncope or decreased hearing. (AR 426). Dr. Comstock prescribed

---

[6] Plaintiff's history of low platelet counts dated back to 2012, and a March 28, 2017 appointment with plaintiff's hematologist, Dr. Dennis Dobrzynski, confirmed thrombocytopenia. (AR 480–81).

hydrocodone-acetaminophen and recommended that plaintiff undergo a tympanostomy to address her potential chronic bilateral middle ear effusion and an adenoidectomy to resolve her adenoidal hypertrophy. (AR 427–28). On April 25, 2017, Dr. Comstock performed a bilateral myringotomy and tympanostomy tube placement and an adenoidectomy. (AR 440–41). Following the procedures, plaintiff reported bloody otorrhea, nasal congestion, a sore throat, dysphagia, and ear pressure, but she indicated at a May 15, 2017 follow-up with Dr. Comstock that most of her symptoms had subsided. (AR 419–23, 799).

On May 25, 2017, plaintiff reported to Dr. Taylor that she was experiencing continued dizziness and "blackouts." (AR 798). Plaintiff indicated that she saw spots and experienced syncope when standing. (AR 798). Dr. Taylor noted that plaintiff's symptoms prevented her from working as a bus driver. (AR 798). At a May 31, 2017 follow-up appointment, plaintiff told Dr. Taylor that she was experiencing constant headaches and acute neck pain. (AR 800).

On June 8, 2017, plaintiff saw her cardiologist, Dr. Azita Moalemi, for an evaluation of her continued dizziness. (AR 626–28). Dr. Moalemi diagnosed likely neurocardiogenic syncope and scheduled plaintiff for an echocardiogram and tilt table test. (AR 628). The echocardiogram results came back normal. (AR 625). Plaintiff had a positive tilt table test, which confirmed her diagnosis for recurrent, partially mediated syncope, and plaintiff was started on midodrine. (AR 621, 994).

On July 20, 2017, plaintiff saw Dr. Moalemi for a follow-up on her positive tilt table test. (AR 616). Plaintiff reported sharp chest pain, palpitations, shortness of breath, swelling in her legs, chronic fatigue, dizziness, and lightheadedness. (AR 616). Plaintiff reported that her syncope symptoms improved on midodrine but that she experienced continued fatigue. (AR 616). Dr. Moalemi prescribed Provigil to treat possible narcolepsy and scheduled plaintiff for a

8

sleep study. (AR 617). At an August 21, 2017 follow-up, plaintiff reported continuing exhaustion and dizziness with limited improvement due to the Provigil. (AR 613).

On December 29, 2017, plaintiff saw Dr. Moalemi regarding her upcoming sleep study.[7] (AR 609). Plaintiff reported a stabbing pain that improved with pressure on her chest. (AR 609). Plaintiff also reported lightheadedness, palpitations, and shortness of breath. (AR 609). Plaintiff indicated that she experienced continued frequent or severe headaches, and Dr. Moalemi increased her midodrine prescription. (AR 609–10).

On February 23, 2018, plaintiff reported a recent dizzy spell and fall while on stairs. (AR 701). Plaintiff denied frequent dizziness after she increased her blood pressure medication. (AR 701). At a March 16, 2018 appointment with Dr. Moalemi, plaintiff reported improvement with Provigil and indicated that she fell asleep less. (AR 605). Plaintiff also reported overall improvement with midodrine. (AR 605). Plaintiff indicated that she was attending a support group for autonomic dysfunction, which helped. (AR 606). On May 24, 2018, Dr. Taylor noted that plaintiff's neurocardiogenic syncope was stable on midodrine but later stated that due to plaintiff's "constant" dizziness and fainting there was only a limited chance that plaintiff's disability with Fairfax County School System would get reversed. (AR 792).

On September 18, 2018, plaintiff denied fainting on her current midodrine dose. (AR 1089). On November 26, 2018, plaintiff reported persistent episodes of "brain fog," but she indicated that Provigil helped. (AR 856). Plaintiff denied tachycardia or other major side effects. (AR 856). Dr. Moalemi noted that plaintiff's blood pressure was a little high and reduced her midodrine prescription. (AR 856).

---

[7] Plaintiff completed a 3-night home sleep study on February 2, 2018. (AR 634). The results of the study were normal with no evidence of sleep apnea. (AR 634).

On June 11, 2019, plaintiff told Dr. Moalemi that she still experienced occasional dizziness but no fainting. (AR 1012). On August 5, 2019, Dr. Taylor noted that plaintiff experienced an episode of syncope while smoking and bruised her lower back and head. (AR 1693).

On August 28, 2019, plaintiff saw Dr. Taylor for primary care. (AR 1711). Plaintiff reported pain and numbness in all positions and recurrent syncope while standing. (AR 1711). Dr. Taylor observed that plaintiff's gait was impaired. (AR 1711). Dr. Taylor issued plaintiff a letter reflecting that plaintiff experienced frequent syncopal episodes and lightheadedness with positional changes. (AR 1908). The letter indicated that plaintiff experienced these episodes without warning and while standing, that she was likely to remain symptomatic, and that she needed to avoid driving. (AR 1908). On September 17, 2019, plaintiff reported to Dr. Said Osman at Advanced Spine Endoscopy & Pain Institute that she had frequent syncopal attacks associated with falls. (AR 1675).

On February 3, 2020, plaintiff reported to her physical therapist that she was fainting one to two times per month. (AR 1886). On March 26, 2020, plaintiff reported an incident of fainting the prior week, which her primary care physician attributed to her neurocardiogenic syncope. (AR 1754).

### ii. Plaintiff's History of Nerve Pain and Weakness (December 2016–January 2019)

On December 7, 2016, plaintiff saw Dr. Vasudha Joshi about a hand injury that she sustained earlier that day. (AR 489–90). Plaintiff hit her hand on a handrailing while boarding the bus and reported a throbbing pain radiating to her left thumb and index finger. (AR 490). Dr. Joshi observed swelling and a pea-sized bump on plaintiff's wrist and decreased range of motion. (AR 490). Dr. Joshi recommended ice packs, a wrist splint, over-the-counter Tylenol,

and modified work duty. (AR 490). At a follow-up appointment on December 12, 2016, plaintiff reported improvement but indicated that she still experienced pain when gripping or closing her hand. (AR 488–89). On December 19, 2016, plaintiff noted improvement and reduced swelling, but she reported some residual soreness. (AR 488). Dr. Joshi recommended continued use of the splint and told plaintiff that she could resume regular work duty on January 3, 2017. (AR 488). On March 1, 2017, plaintiff saw Dr. Taylor for wrist, pinky, and thumb pain and grip problems. (AR 803). Plaintiff reported swelling, weakness, and pain while crocheting. (AR 803). Dr. Taylor observed a ganglion cyst on plaintiff's left wrist. (AR 803).

On March 29, 2017, plaintiff saw her neurologist, Dr. Ramsey Falconer. (AR 478). Plaintiff reported pain on the left side on her neck, and Dr. Falconer noted that her head tilted and turned to the left. (AR 478–79). Dr. Falconer found her symptoms suggestive of left predominant cervical dystonia and recommended botulinum injections. (AR 479). On May 18, 2017, plaintiff reported to Dr. Falconer that her pain was mainly focused on the right side of her neck, but that Soma helped. (AR 469). Dr. Falconer administered botulinum injections into plaintiff's neck and back. (AR 470–71). At a June 19, 2017 follow-up appointment with Dr. Falconer, Plaintiff reported improvement on her right side following the botulinum injections but indicated continued pain on her left side following a period of severe muscle spasms. (AR 467). Dr. Falconer recommended a higher dose for the next round of injections to cover the gap, and he prescribed plaintiff Valium and baclofen. (AR 468).

On July 21, 2017, plaintiff was seen by Michelle Karimzada, PA, at National Spine & Pain Centers for comprehensive pain care following a two-year hiatus. (AR 753). Plaintiff reported throbbing, aching, burning, and tingling pain in her neck and low back at a level of eight out of ten (8/10). (AR 753). Plaintiff also reported decreased activity levels, numbness,

weakness, and swelling.  (AR 753).  PA Karimzada recommended that plaintiff undergo a

cervical epidural steroid injection.  (AR 757).  On August 4, 2017, Dr. Suneetha Budampati

administered the spinal injections.  (AR 749–52).

On August 10, 2017, plaintiff was admitted at Sentara Northern Virginia Medical Center

for acute left wrist drop.  (AR 880).  Plaintiff reported developing numbness in her left wrist and

hand following her epidural injection a week prior.  (AR 899).  On evaluation, plaintiff was

unable to extend her wrist and could flex it only slightly.  (AR 880).  Plaintiff demonstrated full

strength and range of motion of her left elbow and shoulder.  (AR 899).  An MRI of plaintiff's

spine was normal aside from mild disc bulging.  (AR 899).  Plaintiff was given a wrist splint and

discharged on August 11, 2017.  (AR 896).  Plaintiff attended a follow-up appointment with Dr.

Danielle Cherrick at National Spine & Pain Centers, who diagnosed her with left radial nerve

palsy and prescribed steroids and occupational therapy.  (AR 749).

Plaintiff underwent a second round of botulinum injections on August 21, 2017.  (AR

463–66).  Plaintiff reported continuing pain, mainly focused on the right side of her neck, and

severe spasming.  (AR 464).  Dr. Falconer increased the dosage from the first round and

administered the injections to plaintiff's neck and back.  (AR 465–66).

On September 1, 2017, plaintiff saw Dr. Budampati for follow-up on her left radial palsy.

(AR 744).  Plaintiff reported significant improvement due to the steroids but some residual

weakness.  (AR 744).  Plaintiff indicated that she was unable to do formal physical therapy but

that she could participate in a "fairly aggressive" home exercise program.  (AR 745).  Dr.

Budampati noted that plaintiff was able to extend and flex her wrist, make a fist, and demonstrate

finger grasp at "3+ to 4 out of 5 strength."  (AR 745).  Dr. Budampati prescribed Nucynta for

acute pain management and scheduled an ultrasound of plaintiff's arm to evaluate for

12

entrapment. (AR 746). At a September 20, 2017 follow-up appointment with PA Karimzada, plaintiff reported increased activity and improved strength in her wrist and hand but indicated that it was not back to normal. (AR 739). Plaintiff reported continued pain in her left arm, and PA Karimzada recommended that she undergo hydrodissection and participate in physical therapy. (AR 742). On September 26, 2017, Dr. Benjamin Newton performed a hydrodissection of plaintiff's left radial nerve. (AR 731–34).

At an October 25, 2017 follow-up appointment with Dr. Falconer, plaintiff reported improvement with lightheadedness and fainting and denied blacking out or falling. (AR 461). Plaintiff reported continuing neck spasms but denied experiencing an adverse reaction to the latest round of botulinum injections. (AR 461). Plaintiff indicated that her neck felt like a "ton of lead to hold up," and Dr. Falconer observed that she had no clear response to the injections. (AR 461–62). On November 2, 2017, plaintiff reported to PA Karimzada that her neck felt heavy and "crunches." (AR 728).

On November 10, 2017, plaintiff saw Dr. Newton for follow-up. (AR 724). Plaintiff reported no relief from the hydrodissection.[8] (AR 724). Dr. Newton observed weakness of plaintiff's radial, ulnar, and median nerves and symptoms consistent with frozen shoulder. (AR 726). Dr. Newton reviewed a recent MRA of plaintiff's left shoulder, the results of which were normal with no evidence of a rotator cuff tear. (AR 996). Dr. Newton disagreed with the radiologist's assessment and noted cortical irregularity and enthesopathy of the posterior

---

[8] At her November 2 appointment with PA Karimzada, plaintiff reported she did not get much relief following the hydrodissection. (AR 728). Plaintiff also mentioned a recent fall on her wrists, which had increased some wrist pain, but she noted that the pain was improving. (AR 728). Plaintiff indicated that her home exercise program was helping her with her strength and range of motion. (AR 728).

supraspinatus and anterior infraspinatus with possible post-operative changes to the supraspinatus intrasubstance. (AR 727).

On November 30, 2017, plaintiff saw Dr. Budampati for comprehensive pain care. (AR 721). Plaintiff reported intermittent neck pain at a level of four out of ten (4/10). (AR 721). Dr. Budampati discontinued plaintiff's baclofen regimen and started her on tizanidine. (AR 723).

On December 21, 2017, Dr. Newton performed a second hydrodissection of plaintiff's left radial nerve. (AR 715–16). On January 26, 2018, plaintiff saw PA Karimzada for continued left arm pain. (AR 710–11). Plaintiff reported some relief in her upper arm following the second hydrodissection but indicated that the pain moved lower in her elbow. (AR 711). Plaintiff reported limited relief with Nucynta and tizanidine and some relief with gabapentin. (AR 711). PA Karimzada increased plaintiff's Nucynta prescription, discontinued tizanidine, and started plaintiff on Lorzone. (AR 713).

On February 19, 2018, plaintiff saw Dr. Newton for a cervical left facet joint injection. (AR 706). Plaintiff reported continued left arm pain emanating from her shoulder to her elbow. (AR 706). Plaintiff also indicated that the previous hydrodissections provided mild, if any, benefit. (AR 706). On February 23, 2018, plaintiff reported to PA Karimzada that she was able to move her neck a little more following the injections. (AR 701). Plaintiff stated that Nucynta "knock[ed] down the pain level" but that she was having trouble sleeping. (AR 701). Plaintiff reported improvement with Lorzone and denied adverse side effects. (AR 701). Plaintiff indicated that she was able to crochet and regularly participate in her home exercise program. (AR 701). Plaintiff also stated that she recently got a kitten, which helped her get out more. (AR 701). PA Karimzada increased plaintiff's Nucynta prescription. (AR 705). On March 5, 2018,

14

plaintiff reported improvement to her neck and headache pain, but not to her left arm. (AR 698). Dr. Newton administered a second facet joint injection. (AR 699–700).

On March 16, 2018, plaintiff saw PA Karimzada for a follow-up appointment. (AR 694). Plaintiff reported pain at a level of ten out of ten (10/10) but indicated that she had not taken any pain medication due to a same-day appointment with her cardiologist. (AR 694). Plaintiff indicated that the previous facet joint injection provided some relief for a few days but that she continued to get pain down her arm. (AR 694).

On April 4, 2018, plaintiff saw Dr. Newton for follow-up on her neck and left arm pain. (AR 691). Plaintiff reported greater than fifty percent improvement for about twelve days following her second injection but noted that the pain had returned. (AR 691). Plaintiff was happy with the relief and requested another injection. (AR 691). Dr. Newton administered plaintiff's third facet injection and recommended that she consider a radiofrequency facet cervical or repeat hydrodissection. (AR 693). At an April 16, 2018 follow-up with PA Karimzada, plaintiff reported increased headaches after the third injection, but she indicated that the injections provided greater than fifty percent relief for a few days and improved her headaches overall. (AR 686). PA Karimzada noted that the injections provided temporary abolition of symptoms, increased function tolerance, decreased opioid usage, and improved plaintiff's range of motion. (AR 689). PA Karimzada adjusted plaintiff's Nucynta prescription and started her on levorphanol. (AR 689).

On April 25, 2018, plaintiff saw Dr. Budampati for a radiofrequency facet cervical. (AR 682). Prior to the procedure, plaintiff reported her pain at a six out of ten (6/10) and demonstrated an ability to actively extend and flex and radially deviate her left wrist, make a fist, and demonstrate finger strength "at least 3+ to 4 out of 5." (AR 682–84). On May 4, 2018

plaintiff saw Dr. Newton for her third hydrodissection. (AR 679). Dr. Newton noted that plaintiff received "months of relief" following her first two hydrodissections. (AR 679). Dr. Newton performed a left radial nerve hydrodissection at the spiral groove. (AR 679–81).

On May 10, 2018, plaintiff saw PA Karimzada for follow-up on her neck and left arm pain. (AR 674). Plaintiff reported increased pain for a few days following the radiofrequency facet cervical but indicated that her headaches had improved. (AR 674). Plaintiff also reported continuing pain from the hydrodissection and trouble sleeping. (AR 674). Plaintiff noted that the levorphanol helped manage her pain, and she continued exercises provided by a physical therapist, but she declined formal physical therapy because of her inability to drive. (AR 674, 677).

On May 31, 2018, plaintiff reported to Dr. Newton that her headaches had improved following her radiofrequency ablation but that she continued to experience arm pain, primarily towards the posterior aspect. (AR 782). Plaintiff also noted that she had recently visited an eye doctor, who diagnosed poor near and farsightedness and recommended corrective lenses, which plaintiff believed would help with her headaches. (AR 782). Dr. Newton recommended that plaintiff undergo an electromyography (EMG). (AR 785). Plaintiff's left arm EMG was normal aside from minimally low ulnar amplitude. (AR 1618).

On June 7, 2018, plaintiff attended a follow-up appointment with PA Karimzada. (AR 777). Plaintiff reported greater than fifty percent relief of neck pain and improved range of motion following her radiofrequency ablation. (AR 777). Plaintiff also acquired corrective lenses to help with her headaches. (AR 777). Plaintiff reported swelling and pain in her left arm. (AR 777). Plaintiff also indicated that her levorphanol and Nucynta regimen better managed her pain. (AR 777).

16

On July 5, 2018, Dr. Newton observed swelling in plaintiff's left arm with some erythema from the humerus down through the radius and ulna. (AR 772). Plaintiff reported that her left arm pain was anywhere from a seven to a nine out of ten (7–9/10). (AR 772). Dr. Newton ordered left brachial plexus and cervical MRIs. (AR 774, 777). The results of the left brachial plexus MRI were within normal limits, and the cervical MRI revealed generalized loss of normal T2 signal of the intervertebral discs consistent with disc degeneration disease. (AR 861, 1000). Dr. Shanbhag also ordered an MRI of plaintiff's spine, which revealed mild degenerative changes of the lower lumbar region, including mild right and mild to moderate left foraminal narrowing, mild central canal narrowing, and narrowing of the lateral recesses. (AR 1001, 1075).

On August 8, 2018, Dr. Shanbhag began to taper plaintiff off Nucynta and increase her gabapentin prescription. (AR 1076). On September 4, 2018, plaintiff reported worsening lower back pain. (AR 1090). On October 8, 2018, plaintiff indicated that her back brace provided temporary relief. (AR 1100). PA Karimzada prescribed plaintiff Lyrica and began to taper her off gabapentin after she reported limited benefit. (AR 1096, 1100).

On October 15, 2018, Dr. Shanbhag performed a left lumbar medial branch block ("MBB") on plaintiff. (AR 1102). On October 31, 2018, Dr. Shanbhag repeated the procedure on plaintiff's right side. (AR 1107). At a follow-up with PA Karimzada on November 9, 2018, plaintiff reported a greater than eighty percent (80%) abolition of baseline low back pain for the four to six hours immediately following the lumbar MBBs. (AR 1116). Plaintiff also reported a correlative functional increase during that time and denied adverse sequelae. (AR 1116). However, plaintiff indicated that the pain gradually returned to near baseline but stated that the Lyrica provided some additional benefit. (AR 1116).

On November 20, 2018, Dr. Shanbhag performed a second left MBB on plaintiff. (AR 1118). Plaintiff reported greater than eighty percent abolition of her baseline left low back pain for twenty-four (24) hours following her second left MBB. (AR 1159). Plaintiff again noted gradual return of her pain to baseline but indicated additional benefit due to the Lyrica. (AR 1159). PA Karimzada prescribed morphine and began to taper plaintiff off levorphanol after she reported limited relief. (AR 1122–24). On December 18, 2018, plaintiff underwent a second right lumbar MBB. (AR 1129). Plaintiff reported similar significant but temporary benefit following her second right lumbar MBB. (AR 1136).

On December 26, 2018, Dr. Shanbhag performed a left lumbar radiofrequency ablation. (AR 1138). Dr. Shanbhag repeated the procedure on plaintiff's right lumbar on December 31, 2018. (AR 1145). On January 8, 2019, plaintiff reported more than eighty percent abolition of right low back pain and more than sixty percent abolition of left low back pain, sustained to present and with correlative functional increase. (AR 1147–48). Plaintiff denied adverse sequelae and continued taking morphine and Lyrica. (AR 1147).

### iii. Plaintiff's Left Lower Extremity Impairment and Treatment (February–September 2019)

On February 6, 2019, plaintiff saw Dr. Shanbhag for follow-up on her chronic spinal pain. (AR 1214). Plaintiff presented with left foot drop and reported atraumatic onset ten days earlier. (AR 1214). Dr. Shanbhag referred plaintiff for a consultation with her neurologist and ordered lumbar and left knee MRIs and X-rays. (AR 1207–08). Plaintiff's spine MRI showed degenerative hypertrophic facet changes and disc bulges at the L4-L5 vertebrae, but no evidence of acute fracture and no significant findings. (AR 1042–43). Plaintiff's left knee MRI showed grossly intact ligaments and no evidence of meniscal tear but revealed chondromalacia with associated subchondral marrow edema. (AR 1039–40). Plaintiff's spine X-ray showed mild

18

multilevel spondylosis with endplate changes, osteophytes, and facet arthrosis.  (AR 1041).

Plaintiff's knee X-ray was normal.  (AR 1044).  Dr. Karimzada recommended that plaintiff

undergo epidural steroid injections to resolve her left foot drop.  (AR 1217).  On April 8, 2019,

plaintiff reported improved strength in her left foot due to her home exercise plan.  (AR 1232).

Plaintiff also indicated that she obtained another new kitten, which kept her busy.  (AR 1232).

On June 5, 2019, plaintiff underwent a transforaminal epidural steroid injection to resolve

her left foot drop.[9]  (AR 1242).  On the day of the procedure, plaintiff reported her pain at a level

of ten out of ten (10/10).  (AR 1244).  Plaintiff reported more than ninety percent (90%)

abolition of baseline low back and left lower limb pain following the injection but noted a

gradual return to baseline.  (AR 1256).  At a follow-up appointment with PA Karimzada,

plaintiff reported that she wore her braces nightly and that she used a topical cream, which

provided some additional benefit.  (AR 1251).  At an appointment with Dr. Moalemi, plaintiff

reported improved movement but residual numbness.  (AR 1012).

On June 19, 2019, Dr. Shanbhag administered a second transforaminal epidural steroid

injection.  (AR 1256).  Following this injection, plaintiff reported eighty percent abolition of

baseline low back and left lower limb pain with a gradual return to baseline.  (AR 1838).

Plaintiff received a third epidural on July 11, 2019.  (AR 1835–36).

On September 17, 2019, plaintiff saw Dr. Osman for treatment of her low back and left

lower extremity pain, numbness, weakness, and paresthesia.  (AR 1675).  Plaintiff reported her

pain at a level of four out of ten (4/10).  (AR 1675).  Plaintiff indicated that she could walk less

than five minutes before she had to sit down and described a sharp, shooting, and throbbing pain

that radiated into her left leg constantly and into her right leg intermittently.  (AR 1675).

---

[9] Plaintiff's epidural was postponed while she received oral surgery.  (AR 1226).

Plaintiff reported improvement in left leg strength following her treatment for left foot drop but noted significant residual weakness. (AR 1675).

On August 6, 2019, plaintiff saw Dr. Shanbhag for follow-up on her chronic spinal pain. (AR 1801). Dr. Shanbhag noted that plaintiff experienced temporary but significant abolition of pain following the epidural steroid injections. (AR 1801). Dr. Shanbhag recommended another round of lumbar MBBs and a surgical consultation for plaintiff's spine and left leg pain. (AR 1805). Plaintiff underwent a lumbar MBB on August 20, 2019. (AR 1798). Plaintiff denied abolition of baseline left lower back pain after the first set of injections. (AR 1789). A September 25, 2019 MRI of plaintiff's spine revealed moderate stenosis at the L4-L5 vertebrae. (AR 1679–80). Plaintiff was identified as a candidate for spinal surgery and instructed to quit smoking. (AR 1785).

### iv. Plaintiff's Spinal Fusion Surgery and Physical Therapy (December 2019–September 2020)

On December 27, 2019, plaintiff underwent a surgical fusion of her L4-L5 vertebrae. (AR 1682–84). Dr. Osman performed a discectomy and inserted a mixture of allograft bone chips and bone marrow aspirate into a cage which was then placed in the disk space and secured with pedicle screws and rods. (AR 1683). Plaintiff responded well to the procedure and was discharged on December 28, 2019. (AR 1682–83).

On January 10, 2020, plaintiff saw PA Karimzada for her pain medication management. (AR 1766). Plaintiff reported taking Dilaudid following her spinal fusion but indicated that she had better relief on Soma. (AR 1766). Plaintiff indicated that she was no longer taking morphine or Lyrica. (AR 1766). Plaintiff reported some numbness in her right arm following surgery. (AR 1766). PA Karimzada refilled plaintiff's Lyrica prescription and directed her to follow up with Dr. Osman. (AR 1772).

20

On January 16, 2020, plaintiff saw Dr. Osman for a post-surgical follow-up. (AR 1673). Plaintiff reported that her preoperative symptoms had resolved except for some residual numbness and weakness in her left leg. (AR 1673). Plaintiff denied developing any new symptoms following surgery. (AR 1673). Dr. Osman noted that plaintiff's incision was healing well and observed five out of five (5/5) strength in her lower extremities except for her left ankle, which he categorized at four out of five (4/5) strength. (AR 1673).

On February 3, 2020, plaintiff began physical therapy at Inova Physical Therapy. (AR 1886). Plaintiff indicated that the surgery went well but that she had a lot of pain afterwards that required hospital admission.[10] (AR 1886). Plaintiff reported numbness in both feet and her lower back and left foot drop following surgery but stated that it had improved. (AR 1886). Plaintiff also reported constant pain and an inability to bend over or pick up light objects without pain. (AR 1886). Plaintiff indicated that she was unable to stand for greater than two minutes without significant pain. (AR 1886). When navigating stairs, plaintiff used a step-to pattern and handrail. (AR 1886). Plaintiff's physical therapist observed that plaintiff demonstrated an antalgic gait, decreased knee flexion, decreased hip extension, decreased heel strike, decreased stance phase, decreased toe off, and altered trunk rotation with decreased arm swing. (AR 1888).

On February 10, 2020, plaintiff's physical therapist recommended that she acquire new shoes due to foot supination while walking and provided her with a transcutaneous electrical nerve stimulation (TENS) device for home use. (AR 1893). Plaintiff reported improvement following use of the TENS device. (AR 1894). On February 26, 2020, plaintiff's physical

---

[10] The AR does not contain any records of hospitalization for spinal pain between December 28, 2019 (the date of plaintiff's discharge following surgery) and February 3, 2020 (the start of plaintiff's physical therapy). Dr. Osman noted that plaintiff's pain was well-controlled with medication at discharge. (AR 1745).

therapist observed swelling on plaintiff's entire left low back to left leg, and she reported a burning, cutting pain that had started two days earlier. (AR 1897). Plaintiff indicated that she was having difficulty standing, laying down, and sitting. (AR 1897). Plaintiff also reported left foot cramps and swelling and pain in her left shoulder. (AR 1897). Plaintiff's physical therapist observed that she moved a lot in her chair due to her discomfort. (AR 1898). Plaintiff's physical therapy sessions were put on hold pending further instructions from Dr. Osman. (AR 1898).

On February 27, 2020, plaintiff saw Dr. Osman for post-surgery follow-up. (AR 1737). Plaintiff reported severe left lateral hip pain radiating to her lower back and lateral left knee. (AR 1737). Plaintiff also reported difficulty walking and indicated that she could not lie down on her left side without pain. (AR 1737). Dr. Osman diagnosed plaintiff with bursitis and gave her a steroid injection of the left trochanteric bursa. (AR 1741). Plaintiff reported significant abolition of her left hip pain following the injection. (AR 1754). Plaintiff completed her physical therapy and continued with home exercises. (AR 1754).

On May 12, 2020, plaintiff saw PA Karimzada for follow-up of her chronic spinal pain and medication management. (AR 1926). Plaintiff reported atraumatic intensification of her low back and leg pain, which made it difficult to get in and out of bed or change positions.[11] (AR 1926). PA Karimzada ordered an MRI of plaintiff's spine, recommended repeat epidural steroid injections, and prescribed plaintiff hydrocodone. (AR 1929). The MRI revealed no evidence of recurrent disc herniation or stenosis but showed degenerative disc and facet changes at all levels. (AR 1931–32).

---

[11] Plaintiff reported to PA Karimzada that she went to the emergency room on the preceding Friday. (AR 1926). Plaintiff also reported to Dr. Taylor that she went to the Mt. Vernon Hospital emergency room on May 30, 2020. (AR 1943).

On May 29, 2020, Dr. Shanbhag ordered a lumbar CT. (AR 1939). The CT revealed grade one anterolisthesis of L4 on L5, but the lumbar spine was otherwise anatomic in alignment. (AR 1947). There were no suspicious lytic or blastic lesions or pars defects, and the surgical pedicles were intact and facets well-aligned. (AR 1947). The CT also showed mild asymmetric right-sided facet arthrosis at L5-S1 and degenerative changes present along the sacroiliac joint with marginal sclerosis. (AR 1947–48).

On June 8, 2020, plaintiff underwent an electromyography/nerve conduction study at Prince William Neurology. (AR 1956). The results noted peripheral sensory/motor neuropathy of predominantly axonal type with diabetes mellitus identified as a potential underlying etiology. (AR 1956). The study did not reveal evidence of lumbosacral radiculopathy or myopathy. (AR 1956). Plaintiff underwent a second electromyography/nerve conduction study on July 1, 2020. (AR 1950). The results noted mild bilateral carpal tunnel syndrome and evidence of mild bilateral cubital tunnel syndrome, both greater on plaintiff's right side. (AR 1950). The study did not reveal evidence of crevicular radiculopathy. (AR 1950).

On July 9, 2020, plaintiff saw Dr. Osman for post-operative follow-up. (AR 1957). Plaintiff reported increased gluteal and hip pain and pain and dysesthesia in both legs. (AR 1957). Plaintiff indicated that a therapeutic injection from Dr. Shanbhag provided very brief benefit, but she reported constant pain aggravated by standing, walking, rolling in bed, and sitting for more than fifteen minutes. (AR 1957). Dr. Osman performed a musculoskeletal examination and observed no tenderness, swelling, deformities, evidence of instability, weakness, atrophy, or alterations of tone. (AR 1959). Dr. Osman also noted that plaintiff exhibited full and painless range of motion. (AR 1959).

23

On July 16, 2020, plaintiff underwent X-rays of her sacroiliitis joints, spine, and hips, and a CT bone mineral density exam. (AR 1962–69). The X-rays of plaintiff's sacroiliitis joints and hips were negative for any abnormalities. (AR 1962, 1966). The X-ray of plaintiff's spine showed mild narrowing of the L3-L4 disc space but no acute or significant abnormalities. (AR 1964). Plaintiff's CT bone mineral density exam revealed that plaintiff was osteopenic and at increased risk for future fracture. (AR 1968).

On September 18, 2020, plaintiff underwent a fusion of her right sacroiliac joint and received an intra-articular steroid injection in her left sacroiliac joint.[12] (AR 26–27). This occurred after plaintiff complained of increasing pain and an inability to function due to severe sacroiliac pain. (AR 26). Following surgery, plaintiff reported excellent pain relief on the left side with gradual return of symptoms and only surgical pain on the right side. (AR 29).

### v. Plaintiff's Mental Health History

Plaintiff's medical records reflect treatment for anxiety and depression. On April 5, 2016, plaintiff was admitted to Mount Vernon Hospital following a suicide attempt. (AR 505). Plaintiff reported that she took an entire bottle of naproxen following a fight with her daughter. (AR 505). Plaintiff presented with a history of depression and indicated that she "felt like end of the line." (AR 506). Plaintiff also reported a prior suicide attempt when she overdosed on Ritalin approximately seven years earlier. (AR 518). Plaintiff indicated that her primary care physician prescribed her Lexapro, which she had been taking for six to seven years. (AR 518).

On April 6, 2016, plaintiff underwent a psychiatric consultation with Dr. Jason Williams. Plaintiff indicated that she regretted the act and denied suicidal thoughts. (AR 516). Plaintiff

---

[12] This procedure occurred after the ALJ's August 26, 2020 decision on plaintiff's disability application. (AR 34–49). These records were provided to the Appeals Council when plaintiff appealed the ALJ's adverse finding. (AR 14).

attributed the overdose to a fight with her daughter and stress about her adult children living at home. (AR 517). Plaintiff reported increased crying spells over the previous month but denied other symptoms of depression. (AR 517). Dr. Williams found that this was an impulsive overdose and that it was appropriate to discharge plaintiff with family to seek outpatient counseling. (AR 516).

On May 9, 2017, plaintiff saw Dr. Taylor for primary care. (AR 799). Plaintiff reported weight loss and indicated that she had not been eating a lot. (AR 799). Plaintiff also reported panicking and indicated that she and her husband were attending couples' therapy. (AR 799). Plaintiff reported that she was taking Xanax and Lexapro and that she started attending individual therapy, but she felt overwhelmed because of marital challenges. (AR 799). Dr. Taylor diagnosed plaintiff with anxiety and depression. (AR 799). At a follow-up appointment with Dr. Taylor in late May, plaintiff reported emotional breakdowns and indicated that she was unable to see her psychiatrist but that she was continuing twice weekly therapy (individual and marital). (AR 798).

On August 15, 2017, plaintiff reported to Dr. Taylor that her psychiatrist had increased her Xanax prescription. (AR 797). On November 29, 2017, she indicated that she had moved away from her psychiatrist following abrupt Xanax withdrawal. (AR 794). Plaintiff also reported continued family issues. (AR 794).

On February 27, 2018, plaintiff reported panic triggered by loud sudden noises. (AR 793). Plaintiff indicated that she was spending less time in therapy, and Dr. Taylor noted that her depression was stable on Lexapro. (AR 793). By November 2018, plaintiff indicated that she was experiencing decreased anxiety attacks. (AR 856).

25

On May 29, 2019, plaintiff reported anxiety and panic, especially while driving. (AR 1021). Plaintiff was referred for a psychiatric evaluation with Dr. Dennis Cozzens. (AR 1266). Plaintiff reported anxiety and depression which manifested through social issues and isolation. (AR 1266). Dr. Cozzens noted that plaintiff had issues sleeping and demonstrated decreased energy. (AR 1267). Dr. Cozzens found that plaintiff was depressed and anxious and reported her insight as poor and her judgment as fair. (AR 1267). Dr. Cozzens also noted that plaintiff experienced crying spells. (AR 1267). Dr. Cozzens increased plaintiff's Lexapro prescription and prescribed her trazodone and Seroquel. (AR 1268).

On September 18, 2019, Kimberly Carr, a licensed clinic social worker with Dr. Cozzens' office, drafted a letter for plaintiff that reflected diagnoses of recurrent major depressive disorder, chronic post-traumatic stress disorder, and provisional panic disorder with agoraphobia. (AR 1272). The letter noted plaintiff's history of depressed mood, severely diminished interest in almost all activities, hopelessness, significant weight gain, sleep disturbances, lethargy, feelings of worthlessness, and a decreased ability to focus, concentrate, or make decisions. (AR 1272). The letter observed that plaintiff was compliant with her treatment and that she participated in outpatient treatment one to two times weekly. (AR 1272). It also indicated that she would be receiving cognitive therapy, coping skills, relaxation techniques, and behavior management tools. (AR 1272).

### vi. Medical Opinions on Plaintiff's Disability Claim

On June 29, 2018, plaintiff's claim for disability was evaluated by state agency physicians at the initial level. (AR 131–44). Dr. Robert McGuffin noted that plaintiff reported needing help dressing and wore only loose-fitting clothing, that she could not hold things with her left hand but that she was able to fix simple meals several times a week, load the dishwasher,

complete light housework, and go outside daily.  (AR 135).  Dr. McGuffin noted that an October

25, 2017 examination revealed plaintiff had normal muscle bulk with no muscle pain and

strength of five out of five (5/5) in all areas.  (AR 135).  Dr. McGuffin also noted that plaintiff's

sensation was grossly intact and that her gait was well-balanced and stable.  (AR 135).  Dr.

McGuffin reported that a March 16, 2018 exam indicated that plaintiff experienced no chest

pressure or pain, lightheadedness, fatigue, palpitations, shortness of breath, point or back pain,

swelling in the extremities, weakness, numbness, or migraines.  (AR 135).  Dr. McGuffin found

that some of plaintiff's symptoms appeared to be disproportionate to the severity and duration

that would be expected based on her medically determinable impairments.  (AR 138).  Dr.

McGuffin also found that plaintiff was capable of occasionally lifting or carrying ten pounds and

could frequently lift less than ten pounds.  (AR 139).  Dr. McGuffin noted that plaintiff could

stand or walk for a total of two hours and sit for a total of six hours in an eight-hour day and that

plaintiff's ability to push or pull was generally unlimited.  (AR 139).  Dr. McGuffin found that

plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, and

that plaintiff could perform sedentary work.  (AR 139–41).  In her psychiatric review of records,

Dr. Jo McClain observed that plaintiff demonstrated fluent speech and good comprehension.

(AR 136).  Dr. McClain identified normal mood and affect with normal attention span and

concentration.  (AR 136).  Dr. McClain noted plaintiff's history of depression and found that she

was not significantly limited.  (AR 136).  For these reasons, the state physicians found that

plaintiff was not disabled at the initial level.  (AR 141).

    The state agency physicians upheld this finding at the reconsideration level.  (AR 159).

Dr. Jack Hutcheson noted that plaintiff experienced dizziness and migraines, which had

improved.  (AR 152).  Dr. Hutcheson reported that plaintiff experienced left arm pain and

sensitivity with decreased range of motion and slightly reduced strength. (AR 152). Dr.

Hutcheson found that there were no abnormalities in plaintiff's gait or strength and that she

could perform limited light work. (AR 152). Dr. Hutcheson also found that plaintiff could

occasionally lift or carry up to twenty pounds and could frequently carry ten pounds. (AR 155).

Dr. Hutcheson noted that plaintiff could stand, walk, or sit for a total of six hours in an eight-

hour workday. (AR 155–56). Dr. Hutcheson found that plaintiff could occasionally climb

ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl. (AR 156).

Dr. Hutcheson found that plaintiff had a limited ability to reach left in front, laterally, or

overhead but that her capacity to handle, finger, and feel was unlimited. (AR 156–57). Dr.

Howard Leizer found that plaintiff had received sporadic mental health treatment and that her

overall mental status exams were normal. (AR 153). Dr. Leizer did not find any cognitive

impairments or limitations and that her depression was a non-severe impairment. (AR 153).

On May 29, 2019, plaintiff saw Dr. Taylor for her disability paperwork with the Fairfax

County School system. (AR 1021). Dr. Taylor observed that plaintiff demonstrated restrictions

moving her arms, sitting, standing, lifting, carrying, and reaching. (AR 1021). Dr. Taylor found

that plaintiff would be unable to perform her duties as a bus driver. (AR 1021).

Following her initial hearing before the ALJ, plaintiff was referred for a psychological

evaluation with Dr. Carol McCleary on November 7, 2019. (AR 1635). Dr. McCleary observed

that plaintiff presented with adequate appearance and personal hygiene, that she was cooperative,

and that her gait and posture were within normal limits, although she rocked on the sofa. (AR

1635). Plaintiff reported avoiding social situations due to her anxiety and stress and indicated

that she had no friends but that she enjoyed crafting. (AR 1636). Plaintiff indicated that she

could use the bathroom and telephone without assistance and could order groceries online but

28

that she required help from her husband with using the shower, getting dressed, and administering her medication. (AR 1636). Plaintiff also reported that her husband primarily managed grocery shopping, preparing meals, finances, and laundry. (AR 1636). Plaintiff indicated that she began seeking ongoing treatment for her panic attacks, anxiety, and crying spells in June 2019 and that treatment was very helpful. (AR 1637). Dr. McCleary reported that plaintiff demonstrated normal eye contact and a sad and anxious affect with broad range and normal intensity. (AR 1638). Plaintiff admitted suicidal ideations but was found to be low risk because she lacked a current intent or plan to act. (AR 1638). Dr. McCleary noted that plaintiff was alert and oriented to self, situation, place, and time. (AR 1638). Plaintiff demonstrated adequate insight and understanding of her mental health with average judgment and memory. (AR 1638). Dr. McCleary noted that plaintiff's prognosis was good and that she was only mildly impaired in her ability to complete detailed and complex tasks and perform work activities without special or additional supervision. (AR 1639–40). Dr. McCleary found that plaintiff was markedly impaired in her ability to maintain regular attendance at the workplace, complete a normal workday or workweek without interruption, and deal with the usual stresses encountered in competitive work. (AR 1639–40).

On December 14, 2019, plaintiff was referred to Dr. Jian Ming Mei for evaluation. (AR 1648–61). Dr. Mei observed that plaintiff's gait was slow, unsteady, and limping and that plaintiff was not using an assistive device. (AR 1652). Plaintiff had no palpable muscle spasms and demonstrated muscle strength of five out of five (5/5) for all muscle groups. (AR 1652). Dr. Mei noted no joint swelling or effusion, erythema, tenderness, or deformity but did observe patellar crepitus. (AR 1653). Plaintiff demonstrated an ability to lift, carry, and handle light objects and showed normal fine and gross manipulative skills. (AR 1653). With moderate

29

difficulty, plaintiff was able to squat and rise, rise from a sitting position without assistance, get up and down from the exam table, and walk on her heels and toes. (AR 1653). Plaintiff demonstrated normal tandem walking and could stand, but not hop, on one foot bilaterally. (AR 1653). Plaintiff exhibited range of motion within normal limits. (AR 1653–54). Dr. Mei found that plaintiff had no limitations with sitting but that she could stand for only thirty minutes at a time for four hours total in an eight-hour workday. (AR 1654). Dr. Mei also found that plaintiff could walk for only ten minutes at a time for four hours total in an eight-hour workday and that she required a cane for long distances and uneven terrain. (AR 1654–55). Dr. Mei noted that plaintiff could lift and carry at least ten pounds frequently and twenty pounds occasionally. (AR 1655). Plaintiff showed limitations with bending, stooping, crouching, and squatting, which could be done only occasionally, but no limitations on reaching, grasping, handling, fingering, and feeling, and no visual, communicative or workplace environmental limitations. (AR 1655).

On May 13, 2020, Dr. Taylor filled out a Medical Source Statement Form. (AR 1919–20). Dr. Taylor reported plaintiff's diagnoses of diabetes, asthma, depression, anxiety, vitamin deficiencies, obesity status post gastric surgery, history of tobacco abuse, neurocardiogenic syncope, narcolepsy, and panic with agoraphobia. (AR 1919). Dr. Taylor found that plaintiff could occasionally lift less than ten pounds and could sit, stand, or walk for less than one hour in an eight-hour workday. (AR 1919–20). Dr. Taylor indicated that plaintiff would not be able to sit continuously in a work setting and that she was incapable of tolerating low work stress. (AR 1920). Dr. Taylor reported that plaintiff's symptoms would affect her ability to concentrate for two-thirds of an eight-hour workday and that she would likely be absent more than three times per month. (AR 1920). Dr. Taylor indicated that plaintiff's prognosis was fair and that she

would remain symptomatic permanently even with treatment.  (AR 1920).  Dr. Taylor

recommended a finding of permanent disability.  (AR 1920).

### C.     The ALJ's Decision on August 26, 2020

The ALJ concluded that plaintiff was not disabled under sections 216(i) and 223(d) of the

Social Security Act based on her application for DIB for the alleged onset period of January 17,

2017 through the date of the decision, August 26, 2020.  (AR 49).  When determining whether an

individual is eligible for DIB, the ALJ is required to follow a five-step sequential evaluation.  *See*

20 C.F.R. §§ 404.1520(a), 416.920(a).  It is this process that the court examines to determine

whether the correct legal standards were applied and whether the ALJ's final decision is

supported by substantial evidence.  *See id.*

The ALJ must consider whether a claimant: (1) is currently engaged in substantial gainful

employment; (2) has a severe impairment; (3) has an impairment that meets or equals any of the

impairments listed in Appendix 1, Subpart P of the regulations that are considered *per se*

disabling; (4) has the ability to perform past relevant work; and (5) if unable to return to past

relevant work, whether the claimant can perform other work that exists in significant numbers in

the national economy.  *See id.*  The claimant bears the burden to prove disability for the first four

steps of the analysis.  *See McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir. 1983).  The

burden then shifts to the Commissioner at step five.  *See id.*  When considering a claim for DIB,

the Commissioner must also determine whether the insured status requirements of sections 216(i)

and 223 of the Social Security Act are met.  *See* 42 U.S.C. §§ 416(i), 423.  The regulations

promulgated by the Social Security Administration provide that all relevant evidence will be

considered in determining whether a claimant has a disability.  *See* 20 C.F.R. §§ 404.1520(a)(3),

416.920(a)(3).

Here, the ALJ made the following findings of fact and conclusions of law:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

(2) The claimant has not engaged in substantial gainful activity since January 17, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).

(3) The claimant has the following severe impairments: degenerative disc disease, s/p lumbar fusion operation, degenerative joint disease, obesity, sleep apnea, fibromyalgia, chronic pain syndrome, neurocardiogenic syncope, wrist radial nerve palsy, carpal tunnel syndrome, diabetes, neuropathy, left plantar fasciitis, affective disorder, anxiety, and post-traumatic stress disorder ("PTSD") (20 CFR 404.1520(c)).

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(5) After careful consideration of the entire record, the ALJ found that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(b) where the claimant lifts or carries 10 pounds occasionally and less than 10 pounds frequently, stands or walks for two of eight hours during the workday, and sits for six of eight hours during the workday. The claimant can frequently finger and handle bilaterally. The claimant can frequently reach (including overhead). The claimant can have no work at unprotected heights, around dangerous moving machinery, open flames, and bodies of water. The claimant can perform simple, unskilled (SVP 1 or 2, 1-3 step processes) work.

(6) The claimant is unable to perform any past relevant work (20 CFR 404.1565).

(7) The claimant was born in 1974 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

(8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

(11) The claimant has not been under a disability, as defined in the Social Security Act, from January 17, 2017, through the date of this decision (20 CFR 404.1520(g)).

(AR 39–49). The Appeals Council declined to review the ALJ's decision finding no reason to do so under its rules. (AR 13).

## IV. ANALYSIS

### A.    Overview

Plaintiff's motion for summary judgment raises three primary arguments. First, plaintiff argues that the ALJ's finding that plaintiff was not disabled is unsupported by substantial evidence. (Docket no. 16-1 at 10–13). Plaintiff argues that the ALJ engaged in "cherrypicking" when considering plaintiff's history of neurocardiogenic syncope and headaches, radial nerve palsy and mobility, and mental health issues. *Id.* Second, plaintiff argues that the Appeals Council erred when it failed to include plaintiff's death certificate in the administrative record. *Id.* at 13–14. Plaintiff argues that the death certificate should have been exhibited and considered by the Appeals Council because plaintiff's death was attributed to causes designated severe by the ALJ. *Id.* Finally, plaintiff argues that the decisions by the ALJ and Appeals Council are constitutionally defective because they derive their authority from the Commissioner of the Social Security Administration whose appointment as a single head of the agency removeable only for-cause violates the separation of powers. *Id.* at 14–17.

In response, the Commissioner argues that there is substantial evidence to support the ALJ's determination that plaintiff was not disabled. (Docket no. 19 at 12–16). The Commissioner claims that the ALJ properly considered the evidence in the record when making

his assessment of plaintiff's residual functional capacity (RFC). *Id.* The Commissioner also argues that the Appeals Council properly determined that plaintiff's death certificate was immaterial because it related to a period after the ALJ's August 26, 2020 decision and that any error in failing to include it in the administrative record was remedied by the Commissioner's supplemental filing. *Id.* at 16–17. Finally, the Commissioner argues that plaintiff is not entitled to a rehearing on separation of powers grounds because plaintiff was not actually harmed by the challenged removal provision. *Id.* at 17–28. For the reasons discussed below, the undersigned recommends a decision affirming the ALJ's ruling and finding that (1) the ALJ's decision was supported by substantial evidence, (2) the Appeals Council properly declined to exhibit plaintiff's death certificate, and (3) plaintiff is not entitled to a new hearing based on separation of powers grounds.

**B.    The ALJ's finding that plaintiff was not disabled is supported by substantial evidence.**

A review of the extensive record in this case reveals that substantial evidence supports the ALJ's finding that plaintiff retained the residual functional capacity to perform sedentary work as limited by the ALJ. Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro*, 270 F.3d at 176 (quoting *Richardson*, 402 U.S. at 401). If the ALJ's factual findings are supported by substantial evidence, the district court should affirm the final decision of the Commissioner. *Mascio*, 780 F.3d at 634.

*i.    The ALJ's evaluation of plaintiff's neurocardiogenic syncope and headaches*

The ALJ properly considered plaintiff's history of neurocardiogenic syncope in determining that plaintiff was not disabled. Plaintiff argues that the ALJ's observation that plaintiff was never hospitalized for fainting shows that he failed to account for plaintiff's

34

neurocardiogenic syncope in the RFC analysis. (Docket no. 16-1 at 10–11). That plaintiff was never hospitalized for fainting was only one part of the ALJ's evaluation of plaintiff's neurocardiogenic syncope. As noted above, neurocardiogenic syncope was one of plaintiff's severe impairments the ALJ found at step two of the analysis. In considering that severe impairment, the ALJ noted that plaintiff reported decreased dizziness in May 2017 and demonstrated a normal gait. (AR 44, 419–20). The ALJ considered Dr. Falconer's report from October 2017 that plaintiff experienced some dizziness but that she demonstrated full strength and a normal gait and that she was able to perform heels, toes, and tandem gait. (AR 44, 461–62). The ALJ noted that plaintiff reported feeling better in March 2018 and that she mentioned only one episode of falling. (AR 44, 605). The ALJ also observed that with her medication plaintiff's neurocardiogenic syncope was stable in May 2018 despite some recent fainting due to low blood pressure. (AR 44, 792, 1886). The ALJ referenced plaintiff's report to Dr. Mei that she fell frequently but that this was improved by medication. (AR 44, 1648). The ALJ also referenced Dr. Mei's evaluation that plaintiff had a negative Romberg sign and demonstrated normal hand/eye coordination, finger to nose and heel to shin testing. (AR 45, 1652). The ALJ's opinion reflects extensive consideration of plaintiff's neurocardiogenic syncope and its effect on her RFC which was limited to sedentary work along with restrictions related to unprotected heights, dangerous machinery, open flames, and bodies of water. (AR 43–48).

There is substantial evidence in the administrative record that plaintiff's neurocardiogenic syncope was generally well-managed with medication. On July 20, 2017, plaintiff reported to Dr. Moalemi that her syncope symptoms had improved since she had been taking midodrine. (AR 616). On February 23, 2018, plaintiff reported a recent dizzy spell and fall but denied frequent dizziness after increasing her blood pressure medication. (AR 701). Plaintiff again

reported improvement with midodrine on March 16, 2018. (AR 605). On May 24, 2018, Dr.

Taylor noted that plaintiff's syncope was stable on midodrine. (AR 792). On September 18,

2018, plaintiff denied fainting on her current midodrine dose. (AR 1089). On June 11, 2019,

plaintiff reported occasional dizziness but again denied fainting. (AR 1012). There is some

evidence that plaintiff's syncope worsened in late 2019, including an August 5, 2019 note by Dr.

Taylor of a recent syncopal episode that resulted in bruising to plaintiff's back and head. (AR

1693). On August 28, 2019, plaintiff reported recurrent syncope while standing (AR 1711) and

on September 17, 2019, plaintiff told Dr. Osman that she had frequent syncopal attacks

associated with falls. (AR 1675). Plaintiff also testified at the September 23, 2019 disability

hearing that she experienced four or more fainting episodes per month. (AR 107). However,

plaintiff's condition appears to have improved by early 2020. As of February 3, 2020, plaintiff

reported experiencing only one to two fainting episodes per month. (AR 1886). At the May 19,

2020 hearing, plaintiff reported that the medication helped and that she experienced two to three

fainting episodes per month. (AR 73). Having considered the various statements concerning

plaintiff's complaints of dizziness and fainting, along with statements that her medications

improved her condition, the ALJ determined that plaintiff could perform sedentary work with

several additional limitations concerning potential workplace hazards.

The ALJ also properly considered plaintiff's history of headaches when evaluating her

RFC for sedentary work. Plaintiff argues that the ALJ noted her well-balanced gait without

explaining how it was relevant to her complaints of intractable headaches. (Docket no. 16-1 at

11). However, there is substantial evidence in the record that plaintiff's headaches were

managed by medication and outpatient treatment. Beginning in 2017, plaintiff began reporting

frequent headaches and indicated that she experienced some relief with Imitrex. (AR 431, 486).

36

As the ALJ noted, a March 2017 MRI of plaintiff's brain showed no significant intracranial abnormality. (AR 44, 454). Plaintiff received botulinum injections for her headaches on May 18, 2017 and August 21, 2017. (AR 462–71). In March 2018, plaintiff reported improvement with her headaches following her first facet joint injection. (AR 698). Plaintiff reported continued improvement on May 10, 2018 and again on May 31, 2018 following a radiofrequency ablation procedure. (AR 674, 782). Plaintiff also indicated that she saw her eye doctor about getting corrective lenses to help with her headaches and that she acquired lenses in June 2018. (AR 777, 782). Plaintiff's neurocardiogenic syncope and headaches were generally managed with medication and outpatient treatment, and her medical records provide substantial evidence that she retained the RFC for sedentary work with the additional limitations included by the ALJ in his RFC analysis.

    ii.  *The ALJ's consideration of plaintiff's radial nerve palsy and mobility*

  The ALJ properly addressed plaintiff's history of radial nerve palsy when establishing plaintiff's RFC for sedentary work. As with her headaches, plaintiff argues that the ALJ failed to account for the impairment caused by plaintiff's radial nerve palsy because he observed that plaintiff's gait was normal without explaining how her gait was relevant to the condition. (Docket no. 16-1 at 11). Again, plaintiff's argument reflects only a small portion of the ALJ's analysis. The ALJ considered plaintiff's function report, in which plaintiff reported feeding pets, crocheting, fixing meals, shaving her legs, and shopping by computer. (AR 44, 344–51). The ALJ noted that plaintiff experienced left wrist drop in August 2017 and was unable to extend her wrist. (AR 44, 880). The ALJ also relied on a September 2017 sonogram which showed that plaintiff's radial nerve was hypoechoic, but which lacked evidence of focal caliber change, focal narrowing, or mass lesions. (AR 44, 995). The ALJ again considered Dr. Mei's findings from

his December 2019 examination and noted that plaintiff demonstrated normal hand and wrist range of motion and full strength in wrist flexion and extension, finger abduction, and hand grip. (AR 45, 1652–53).

The ALJ's findings that plaintiff could frequently reach, finger, and handle bilaterally is supported by substantial evidence in the record. Plaintiff was prescribed steroids and occupational therapy following her diagnosis for left radial nerve palsy in August 2017. (AR 749). On September 1, 2017, plaintiff reported some residual weakness but significant improvement overall due to the steroids. (AR 744). Plaintiff indicated that she was participating in a "fairly aggressive" home exercise program and was able to extend and flex her wrist, make a fist, and demonstrate near full finger grasp strength. (AR 745). Later in September 2017, plaintiff again reported improved strength in her wrist and hand. (AR 739). Plaintiff underwent several hydrodissections to relieve her left radial nerve pain between September 26, 2017 and May 4, 2018 and reported months of relief after each procedure. (AR 679–81, 715–16, 731–34). Plaintiff also received several cervical left facet joint injections, which provided substantial, albeit temporary, pain relief. (AR 686–706). In November 2017, plaintiff indicated that her home exercise program was helping with her strength and range of motion. (AR 728). In April 2018, plaintiff again demonstrated an ability to extend and flex and radially deviate her left wrist, make a fist, and demonstrate near full finger strength. (AR 682–84). A June 22, 2018 EMG of plaintiff's left arm was normal aside from minimally low ulnar amplitude. (AR 1618). Dr. Taylor's May 2019 report reflected that plaintiff was limited in her ability to reach, hold, and manipulate, (Docket no. 1027), but this is not inconsistent with the ALJ's finding that she retained the RFC for sedentary work. The ALJ relied on similar findings by the state medical consultant that plaintiff had limitations in left reaching, but the state consultant found that this

would not prevent her from performing even light work. (AR 47, 156–58). The ALJ's decision was also supported by Dr. Mei's evaluation that plaintiff could lift, carry, and handle light objects and that her fine and gross manipulative abilities were grossly normal. (AR 1653).

Plaintiff also claims that the ALJ failed to consider Dr. Mei's finding that plaintiff would need an assistive device to walk more than two hundred feet. (Docket no. 16-1 at 11). The ALJ's opinion, however, thoroughly addresses plaintiff's ambulatory ability. The ALJ considered plaintiff's testimony that she had difficulty walking and Dr. Mei's evaluation that she demonstrated a "slow, unsteady gait" but could walk unassisted with moderate difficulty. (AR 44, 87, 110, 1652–53). The ALJ noted that plaintiff demonstrated a normal gait during her May 2017 appointment with Dr. Comstock and again in August and October 2017. (AR 44, 420, 462, 880). The ALJ explicitly referred to plaintiff's testimony that she does not use an assistive device. (AR 44, 110–11). The fact that the ALJ did not mention Dr. Mei's comment that plaintiff would require a cane to navigate long distances or uneven terrain does not require that the case be remanded. An ALJ must sufficiently explain the evidence on which a finding is based, but "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Reid v. Comm'r of Soc. Sec. Admin.*, 769 F.3d 861, 865 (4th Cir. 2014) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005). Here, the ALJ properly considered the full record, and there is substantial evidence to support his conclusion that plaintiff's physical conditions did not prevent her from performing sedentary work (which would not require navigating long distances or uneven terrain). *See Mastro*, 270 F.3d at 176.

### iii.    The ALJ's analysis of plaintiff's mental health limitations

The ALJ properly considered plaintiff's mental health history to determine that she retained the RFC to perform simple, unskilled sedentary work. Plaintiff argues that the ALJ

erred when he rejected Dr. McCleary's findings that plaintiff demonstrated marked limitations. (Docket No. 16-1 at 11–12). In particular, plaintiff disputes the ALJ's finding that Dr. McCleary's opinions were unpersuasive on balance because they were "completely unsupported by any objective psychological abnormalities or findings in the claimant's mental status exam, and indeed contradicted by the claimant's self-reported abilities and activities." *Id.*; (AR 48). An ALJ need not find a medical opinion persuasive where the opinion is contradicted by substantial evidence in the record. *See Craig*, 76 F.3d at 590; *Johnson v. Barnhart*, 434 F.3d 650, 655 n.8 (4th Cir. 2005); *see also* 20 C.F.R. § 404.1520c(c)(2). Partial weight is appropriate where a medical opinion conflicts in part with other substantial evidence in the record. *See Dunn v. Colvin*, 973 F. Supp. 2d 630, 647–48 (W.D. Va. 2013).

The ALJ properly disclosed the basis for rejecting the portions of Dr. McCleary's opinion that found plaintiff markedly impaired in certain areas. A district court should not attempt to re-weigh conflicting evidence if the ALJ properly explains the basis for the findings. *See Grant v. Astrue*, 574 F. Supp. 2d 559, 564 (E.D.N.C. 2008). Here, the ALJ fully considered Dr. McCleary's findings in determining plaintiff's RFC. The ALJ considered Dr. McCleary's opinion that plaintiff was mildly impaired in her ability to do simple and repetitive or detailed and complex tasks and perform work activities without additional supervision. (AR 47, 1639–40). The ALJ also acknowledged Dr. McCleary's findings that plaintiff was moderately impaired in her ability to perform work consistently, accept instructions from supervisors, and interact with coworkers and the public. (AR 47, 1640). The ALJ considered Dr. McCleary's findings that plaintiff was markedly impaired in her ability to maintain regular work attendance, complete a normal workday without interruption, and deal with usual work stresses, but he ultimately found them unpersuasive in part because they were inconsistent with other findings

from the same consultation.  (AR 47, 1639–40).  The ALJ noted that plaintiff demonstrated a

broad affect and linear thought process during her examination and that she presented with

average intelligence and concentration, a cooperative manner, and adequate appearance and

hygiene.  (AR 47, 1638).  The ALJ also noted plaintiff's "excellent" testing cooperation and

results, good memory, calculations, serial 3's, digit recall, insight, and judgment.  (AR 47, 1638–

39).  The ALJ found Dr. McCleary's opinions as to plaintiff's future performance in the

workplace "speculative at best" and declined to find any "significant mental status deficits."

(AR 47–48).

The ALJ cited to additional evidence beyond the consultation that supports a finding that

plaintiff demonstrated at most moderate mental impairment.  The ALJ found that plaintiff was a

high school graduate and that she showed understanding and appropriate responses during her

hearing testimony.  (AR 45).  The ALJ noted that plaintiff could feed pets, crochet, shop using

the computer, count change, pay bills, and handle financial accounts.  (AR 45, 345–47).  The

ALJ also noted that plaintiff was alert and oriented with normal memory and good concentration

at her examination with Dr. Mei.  (AR 45, 1652).  The ALJ found that plaintiff had mild

limitations in interacting with others but cited to plaintiff's function report that she had meals

with her husband and son and denied having problems getting along with family, friends,

neighbors, authority figures, or others.  (AR 45, 348–50).  The ALJ also found mild limitations

in plaintiff's ability to adapt and manage herself but noted that she was able to prepare simple

meals, load the dishwasher, sweep, perform light housework, shop using the computer, pay bills,

crochet, read, and watch television.  (AR 46, 344–48).  The ALJ noted moderate limitations in

plaintiff's ability to concentrate, persist, or maintain pace.  (AR 46).  The ALJ referenced

plaintiff's periods of "brain fog" and fatigue but found that she was consistently alert and

oriented and that she showed normal attention span and concentration. (AR 46, 344, 462, 684, 856–57, 1267).

Substantial evidence supports the ALJ's determination that plaintiff's mental impairments did not prevent her from performing simple, unskilled (SVP 1 or 2, with 1–3 step processes) sedentary work. Plaintiff argues that the ALJ erred when he found a lack of "objective psychological abnormalities" in the record because plaintiff has a history of suicide attempts and regular treatment, including medication, for her mental health. (Docket no. 16-1 at 12). Although the administrative record includes records of two prior suicide attempts, these occurred in 2009 and April 2016, well before plaintiff's alleged disability onset date of January 17, 2017. (AR 505–19). Furthermore, evidence that plaintiff received medication and treatment for her anxiety and depression does not alone establish disability. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). The administrative record reflects ample evidence that plaintiff's anxiety and depression were largely managed through therapy and medication. On May 9, 2017, Dr. Taylor noted that plaintiff was taking Xanax and Lexapro for her anxiety and depression and that she had recently started individual therapy. (AR 799). On May 25, 2017, plaintiff reported emotional breakdowns and indicated that she was participating in twice weekly therapy (marital and individual). (AR 798). Plaintiff continued therapy throughout the remainder of 2017 and transitioned to a new psychiatrist. (AR 794, 796). On February 27, 2018, plaintiff reported panic due to loud noises but indicated that she was attending therapy less frequently, and Dr. Taylor found that her depression was stable on Lexapro. (AR 793). On November 26, 2018, plaintiff reported decreased anxiety attacks. (AR 856). Plaintiff began seeing Dr. Cozzens in June 2019, and Dr. Cozzens adjusted her prescriptions. (AR 1268, 1272). As of September 18,

2019, plaintiff was compliant with treatment, which included "intensive outpatient treatment one to two times per week," and was scheduled to receive access to additional resources including cognitive therapy, coping skills, relaxation techniques, and behavior management tools. (AR 1272). Plaintiff's medical history provides substantial evidence that her anxiety and depression were generally managed using medication and treatment.

### C. The Appeals Council did not err when it declined to exhibit plaintiff's death certificate because it did not relate to the period on or before the date of the ALJ's decision.

The Appeals Council reasonably determined that the death certificate, which was issued following plaintiff's death on October 30, 2020, did not show a reasonable probability of changing the outcome of the ALJ's August 26, 2020 decision. Plaintiff's death certificate listed her causes of death as diabetes, neurocardiogenic syncope, obesity, and tobacco abuse. (Docket no. 17). Because these conditions were among those considered severe by the ALJ, plaintiff argues that the death certificate was material to the disability claim, and it should have been exhibited by the Appeals Council. (Docket no. 16-1 at 13–14).

Plaintiff's argument is inconsistent with the plain language of the governing regulations. The Appeals Council will review an ALJ's decision denying disability if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 416.1470(a)(5). A claimant submitting post-hearing evidence bears the burden of establishing that it is relevant to the time period preceding the ALJ's decision. *See Nichols v. Colvin*, 100 F. Supp. 3d 487, 513 (E.D. Va. 2015). Although plaintiff's death was attributed in part to impairments that the ALJ found to be severe, it did not occur until more than two months after the ALJ's decision. Furthermore, the onset of these

43

conditions occurred at least three years prior to plaintiff's death, and the ALJ properly

considered them in his evaluation of plaintiff's impairments and RFC.[13]  (AR 39, 44–45, 628,

481–82).  To the extent that the death certificate is relevant to establish a worsening of plaintiff's

condition, a new application for benefits is the appropriate avenue for relief.  *See* 20 C.F.R. §

404.620(a)(2); *see also Dunn*, 973 F. Supp. 2d at 651 ("In situations where a claimant's health

worsens after the ALJ's decision, either due to a progressive condition or a stable condition with

a sudden decline, the proper recourse is to file a new application.").

Plaintiff also argues that the Appeals Council erred when it failed to include the death

certificate in the administrative record.  (Docket no. 16-1 at 13–14).  Any error appears to have

been inadvertent, and it was mooted when the Commissioner filed the supplemental

administrative record on October 1, 2021.  (Docket no. 17).  As plaintiff concedes in her reply

brief, (Docket no. 23-1 at 7), the death certificate is now properly part of the administrative

record and it was noted by the Appeals Council in its decision.  (AR 14).  Because any possible

error concerning the death certificate has been remedied, a remand is unnecessary.

### D.   Plaintiff is not entitled to a remand because she has not established any harm traceable to the purportedly unconstitutional removal statute.

The findings of the ALJ and Appeals Council should be affirmed because plaintiff is

unable to prove that she was harmed by the statute governing removal of a SSA Commissioner.

Plaintiff argues that the appointment of Andrew Saul as Commissioner of the SSA violated the

separation of powers because he was appointed as the single head of an agency and removeable

only for-cause.  *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020); *see*

---

[13] The ALJ did not determine that plaintiff's tobacco abuse was a severe impairment, but plaintiff appears to have quit smoking before her spinal surgery in December 2019.  (AR 1682–84, 1773).

44

*also* 42 U.S.C. § 902(a)(3) ("An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office."). Because ALJs derive their authority from the Commissioner, plaintiff argues that she is entitled to a remand and new hearing before an ALJ with appropriate constitutional authority. (Docket no. 16-1 at 16–17). The Commissioner concedes that the challenged statutory scheme is unconstitutional[14] but argues that plaintiff is not entitled to a remand for two primary reasons. First, the Commissioner argues that there was no constitutional violation here because the ALJ was ratified by an Acting Commissioner subject to removal at-will. (Docket no. 19 at 19–21). Second, the Commissioner argues that plaintiff failed to demonstrate that the removal restriction caused the denial of her claim. (Docket no. 19 at 21–23). The Commissioner raises several other arguments under various legal doctrines such as harmless error, de facto officer, rule of necessity, and broad prudential considerations. (Docket no. 19 at 24–28). The undersigned finds no need to address these issues because plaintiff is not entitled to a remand due to a lack of compensable harm.

　　　　i.　　*The ALJ's appointment under the Acting Commissioner*

　　　　Defendant first argues that remand is not appropriate because the ALJ's appointment was ratified under the authority of an Acting Commissioner who was removeable at will, but this argument is unpersuasive. It is immaterial that the ALJ's appointment was ratified by an Acting Commissioner because the relevant action is not his appointment but his issuance of the

---

　　　　[14] In July 2021, the Office of Legal Counsel issued a memorandum opinion finding that the statutory restriction on at-will removal of the Commissioner violates the separation of powers. *See* Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021) ("OLC Memo"). This conclusion seems compelled by the Supreme Court's recent rulings in *Seila Law* and *Collins v. Yellen*, 141 S. Ct. 1761 (2021).

disability determination and its subsequent affirmance by the Appeals Council.[15]  An ALJ

issuing an opinion on a disability claim is not acting in that ALJ's individual capacity but is

instead exercising the statutory authority of the Commissioner to adjudicate disability claims.

*See* 42 U.S.C. §§ 405, 902; *see also* 20 C.F.R. § 422.203(c).  Here, the ALJ's decision became

the final decision of the Commissioner sixty (60) days after plaintiff was served with the

February 1, 2021 decision of the Appeals Council.  *See* 20 C.F.R. § 498.222.  During this period,

Andrew Saul was the duly appointed Commissioner of the SSA.  As a result, the ALJ's authority

was exercised through a Commissioner clearly subject to the challenged removal provision.  *See*

42 U.S.C. § 902(a)(3).

ii.      *Plaintiff's failure to establish harm arising out of the removal provision*

The Commissioner's second argument—that plaintiff has not proven compensable harm

arising out of the removal statute—carries significantly more weight.  The parties agree that for-

cause removal restrictions on the Commissioner violate the separation of powers, but this is not

the end of the analysis as discussed by the Supreme Court in *Collins*.  In *Collins*, Fannie Mae and

Freddie Mac shareholders brought suit alleging that the statute that created the Federal Housing

Finance Agency (FHFA) violated the separation of powers because it created an independent

agency headed by a single director subject only to removal by the President for-cause.  *See id.* at

1770.  The *Collins* plaintiffs sought return of all dividend payments that had been made to the

Treasury by Fannie Mae and Freddie Mac while FHFA directors were subject to the

---

[15] Even assuming that the Acting Commissioner's role in ratifying the ALJ's appointment is relevant, the plain language of the removal statute does not clearly distinguish between a duly confirmed Commissioner and an Acting Commissioner with respect to removal protections.  *See* 42 U.S.C. § 902(a)(3) ("An individual *serving in the office of Commissioner* may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office.") (emphasis added).

unconstitutional removal scheme. *See id.* The Supreme Court agreed with the plaintiffs that the removal structure violated the separation of powers. *See id.* at 1783. Citing to its opinion in *Seila Law*, the Court reiterated that Congress cannot limit removal of a single head of an independent agency for-cause. *See id.* at 1783–84. However, the Court declined to grant plaintiffs their requested remedy. *See id.* at 1788–89. The Court noted that each of the officers heading the FHFA during the disputed period were properly appointed and that there was no constitutional defect in their appointment. *See id.* at 1787. The Court found it necessary to remand for a determination of whether the plaintiffs suffered actual harm due to the unconstitutional removal provision. *See id.* at 1788–89.

Here, as in *Collins*, plaintiff challenges an action adopted by a properly appointed government official. The cases on which plaintiff relies primarily involve government actors exercising power that they do not lawfully possess. (Docket no. 23-1 at 17); *see Carr v. Saul*, 141 S. Ct. 1352 (2021); *Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148 (3d Cir. 2020); *Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125 (D.C. Cir. 2000). Plaintiff argues that these cases are nevertheless instructive because the ALJ and Appeals Council lacked "a lawful delegation of authority under which to adjudicate and decide this disability claim." (Docket no. 23-1 at 16). Plaintiff offers no support for this proposition beyond a conclusory argument that the challenged removal statute somehow taints the overall authority of the Commissioner to determine eligibility for social security benefits.[16] As the *Collins* Court recognized, however, there is a distinction between the exercise of authority that an official does not possess and the exercise of

---

[16] Plaintiff does not allege defects in the appointment of Andrew Saul as Commissioner of the SSA or in the appointment of the ALJ or members of the Appeals Council. Nor does plaintiff allege that the Commissioner may not delegate authority to an ALJ or to the Appeals Council. In fact, plaintiff acknowledges that the Commissioner is authorized to delegate authority to hear and decide social security cases to an ALJ. (Docket no. 16-1 at 14–15).

proper constitutional authority while subject to unlawful removal conditions. *See Collins*, 141 S. Ct. at 1787–89. The former is presumptively void while the latter requires a showing of actual and causal harm. *See id.* Here, there is no indication that either Commissioner Saul or the ALJ or Appeals Council members exercising authority on his behalf were appointed in violation of the Appointments Clause or that they exceeded the scope of their authority.

With this understanding, plaintiff must demonstrate that the unconstitutional removal provision directly caused her harm to entitle her to the relief that she seeks. *See id.* at 1788–89. That an action was taken by a government official subject to unlawful removal provisions is insufficient alone to warrant invalidation of the action.[17] *See id.* at 1788 n.23 ("Settled precedent . . . confirms that the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office."). The *Collins* Court observed in dicta that an unconstitutional removal provision is automatically displaced by the Constitution but that there may be circumstances in which it nevertheless causes compensable harm. *See id.* at 1788–89. For example, harm could be established if the President was prevented from removing an officer by a court order requiring "cause" for removal or if the President publicly indicated a desire to remove an officer but was unable to do so due to the removal statute. *See id.* at 1789.

Here, plaintiff is unable to establish actual harm. There is no evidence that the removal provision prevented the President from removing Commissioner Saul prior to the decisions of the ALJ and Appeals Council. *See id.* No court order prevented the President from removing

---

[17] Plaintiff argues that a direct showing of harm is unnecessary "[d]ue to the paramount importance of separation of powers concerns and the difficulty any individual would have in vindicating their constitutional rights in the context of a structural challenge." (Docket no. 23-1 at 17–18). This argument was squarely rejected in *Collins*. As noted above, the presumption of harm that is awarded when government officials exceed the scope of their authority is inapplicable in the context of unlawful removal provisions. *See Collins*, 141 S. Ct. at 1787–89.

Commissioner Saul, and plaintiff concedes that there is no evidence that the President desired to remove Commissioner Saul when the ALJ issued his opinion. Instead, plaintiff argues that circumstances changed with the transition in administration, which occurred prior to the Appeals Council review. (Docket no. 23-1 at 20–22). Plaintiff argues that it is "unmistakably clear that President Biden wished to terminate Commissioner Saul immediately upon assuming the Presidency," but that he was prevented from doing so by the removal statute. (Docket no. 23-1 at 20–22). Plaintiff refers to two pieces of evidence to support her claim—the OLC Memo and the White House's official statement on Commissioner Saul's removal—both of which are dated after the Appeals Council decision. (Docket no. 23-1 at 20–22); *see* Nicole Ogrysko, *Biden Fires Saul as SSA Commissioner*, Fed. News Network (July 9, 2021, 5:28 PM), https://federalnewsnetwork.com/people/2021/07/biden-fires-saul-as-ssa-commissioner/. Plaintiff concedes that the OLC Memo does not alone establish that the statute prevented the President from removing Commissioner Saul but argues that this position is confirmed by the White House statement. (Docket no. 23-1 at 20–21). This argument is unavailing as the statement by an unnamed White House official neither references the removal statute at issue nor indicates that the President intended to remove Commissioner Saul as of the date of the Appeals Council decision (or sixty (60) days following its service upon plaintiff, at which point it became the final decision of the Commissioner). *See* Ogrysko, *supra*.

Importantly, plaintiff offers no evidence that an Appeals Council acting under the authority of a Commissioner removeable at-will would have come to a different conclusion. The Appeals Council will review an ALJ's decision for: (1) abuse of discretion, (2) legal error, (3) substantial evidence, (4) policy or procedure that may affect the public interest, or (5) additional evidence that is new, material, and relates to the period on or before the ALJ's decision provided

that there is a reasonable probability that the evidence would change the outcome.  20 C.F. R. § 404.970(a).  Absent one or more of these factors, a claimant is not entitled to automatic *de novo* review of an ALJ's findings.  *See id.*  Plaintiff does not allege that the ALJ abused his discretion or committed legal error[18] or that her claim implicates policy or procedure that affects the public interest.  As noted above, substantial evidence supports the ALJ's findings, and there was no material, pre-decision evidence that would have warranted review by the Appeals Council. Because plaintiff would not have been entitled to Appeals Council review regardless, to award a remand based on the removal provision would put plaintiff in a better position than she would have been in had the provision never existed, a conclusion at odds with established precedent. *See Collins*, 141 S. Ct. at 1801 (Kagan, J., concurring).  Plaintiff has failed to make any connection between the unconstitutional removal provision, as applicable to the Commissioner, and the factual findings of the ALJ, undisturbed by the Appeals Council.  For this reason, a remand is improper.

## V. CONCLUSION

Based on the foregoing, it is recommended that the Commissioner's final decision denying benefits for the period of January 17, 2017 through the date of the ALJ's decision on August 26, 2020 be affirmed.  Accordingly, it is recommended that plaintiff's motion for summary judgment (Docket no. 16) be denied, and the Commissioner's motion for summary judgment (Docket no. 18) be granted.

---

[18] Plaintiff claims in passing that "a presumptively inaccurate legal standard was utilized to adjudicate this disability claim at the administrative level."  (Docket no. 16-1 at 15).  This appears to be an extension of plaintiff's argument that the ALJ lacked constitutional authority, as plaintiff does not raise any issues with the substantive legal standards that the ALJ applied.

50

**NOTICE**

Failure to file written objections to this report and recommendation within 14 days after being served with a copy of this report and recommendation may result in the waiver of any right to a *de novo* review of this report and recommendation and such failure shall bar you from attacking on appeal any finding or conclusion accepted and adopted by the District Judge except upon grounds of plain error.

Entered this 10th day of December, 2021.

                                 /s/
                            John F. Anderson
                            United States Magistrate Judge
                            John F. Anderson
                            United States Magistrate Judge

Alexandria, Virginia